Our second case for this morning is Robert Hoyt v. Michael Benham and others. Mr. Savage. Good morning. My name is Rudolph Savage. I'm representing Robert Hoyt, the appellant in this case this morning. Mr. Hoyt owns 40 acres of landlocked property in rural southern Indiana. The point of this case is to try to get access to it. Now I take it he didn't actually purchase this until 2001, and it seems to me by that time, for better or for worse, it was landlocked. There was an existing road that his predecessor, Bernie Verden, had used, and the Verdens had built a cabin on the 40 acres. But not for a long time before the sale. From several years. Yes, that's correct. There had been a gate placed. Your client, I assume, got a pretty good discount on the land because its predecessor couldn't get to it. If you got a discount, why should you later be able to complain? You're able to complain because the law says that there are certain doctrines recognized in Indiana that give you the right to come to court and try to establish that you have legal access to a property. Well, you can certainly do that. I mean, you can buy a combination of the land and a lawsuit, which may be exactly what Mr. Hoyt chose to do. And as you say, it's his prerogative to do that, although these kinds of cases are not commonly in federal court, since we are immersed in Indiana land law at this point. But it is important that the federal judiciary interpret the law of the land. Yes, and in this case, I think the federal judiciary is called upon to interpret and apply Indiana law. But Hoyt was buying McBride's land, right? He bought the land from a gentleman named Bernie Burden, who had acquired it from his aunt, whose name was Mattie Clark, who had acquired it from the McBrides. Right, and didn't McBride have a right-of-way over leading to the Burma Road? And then McBride sold part of its land to Fussell? Well, that's count five, yes. So why didn't Hoyt inherit the right-of-way that would allow it to reach the Burma Road, West Burma Road? That's exactly what he's trying to do in count five. Well, I thought you wanted fee simple to the road. We have three separate legal theories. We used a bit of a shotgun approach in bringing this action. But I'm not talking about theories. Am I right that you want not just an easement over that road, you want to own that road? Under count one, we allege that Mr. Hoyt acquired fee simple title to a strip of land that leads to the southwest corner of his property from the Burma Road. But part of that theory is that that little .41 acre strip becomes separate from anybody else's land. It's separate from the Hoyt land, it's separate from the Forest Service, it's separate from the Benham properties, whatever. I can't even keep all these things in mind. But it becomes its own little piece of land that's conveyed in fee simple absolute, according to you, after the McBrides convey to the Fessels, and the Fessels, Herman M, gives something or other to the Owens, right? Correct. Either the fee simple or an easement. Fred Owen owned the 40 acres at the north end of this strip at the time that he bought the strip from Herman M. Fessel. So it wasn't a freestanding strip at that point. But by that time it's been severed from the chain of title that eventually makes its way down in 2001 to the Burden-Hoyt transaction. Because Hoyt supposedly got the strip separately from getting the 40 acres, right? That's absolutely correct. He bought the 40 acres in 2001 and he bought the strip in, I think, 2008. Well, I don't understand the argument that a right-of-way could be fee simple. I mean, that would be ridiculous. Think of the Fessels. They have this road running through. And if Hoyt has fee simple to that road, it can prevent the Fessels from using it. Well, we think what happened was that Herman M. Fessel did. But that would be the implication, owning it in fee simple, unless they had ran an easement to the Fessels. That's right. You could put a gate at each end and charge. I'm not sure I follow the concern. What happened was Mr. Fessel sold the strip. Well, look, it's very simple. If they own this road in fee simple, they can prevent the Fessels from using it. Why on earth would, you know, when the original transaction occurred, McBride's predecessors, why would they ever grant a fee simple rather than just the easement? There are several reasons why it would be preferable to acquire fee simple in the situation that Mr. and Mrs. Owen found themselves. They owned a 40-acre tract north of this strip. If they only acquired an easement and not fee simple, then if they wanted to subdivide their 40 acres, that could be construed as adding to the burden of the easement, and they could be prevented from subdividing their 40 acres. But if they own the strip in fee simple, they're free to subdivide their 40 acres. They're also free to acquire other adjoining property. But looking at it from the standpoint of the Fessels, they don't want someone owning a road that runs through their property. Well, the thing of it is it didn't run through their property. It ran along the edge of their property. So that's why I guess I didn't understand your concern before. It's just over on the side of their property. Well, they'd like to use the road, too, wouldn't they? I don't think that there's much, that there's any evidence that the Fessels ever, Mr. Fessel ever used the road. Well, in fee simple, why do they say fee simple instead of right-of-way? Well, because the word right-of-way historically has had two meanings. No, I know, but the natural meaning of what the words imply is that you have a right to use a way, a route, a road. That's the right, the right-of-way. Doesn't it all sound like ownership? If you go back to England when the term right-of-way first developed, you're right. It developed to identify the concept of an easement, a use, a right to use property. That's why they use the word right. But over the years, it came to have two meanings. That's set out in the Joy case from the Supreme Court, which is cited by the Indiana Court of Appeals in the Clark case. But only for railroads, isn't it? No, it's not just railroads. We cited about six other instances where Indiana statutes use the word right-of-way to refer to a fee simple strip. So it is very common to use the word right-of-way to refer to the strip of land that is used as an easement. Are there utility easements that go into Mr. Hoyt's property, or is it really a totally off-the-grid kind of place? Just to answer your question, I don't think there's any evidence in the record, but my understanding is that it's off the grid. Okay. If he had fee simple title to the strip, he could put utilities in there, he could subdivide his property. How could he do that? Wouldn't that still require crossing the government's parcel? Because even if he has fee simple interest in the strip, all he gets to is this right-angle corner. And he's going to need several feet of the government's parcel. That's correct. And the government has a procedure called a special use permit where they're actually mandated by federal law to give the neighbors of Forest Service access to their property. So why? I mean, there's a footnote in one of the briefs indicating that Mr. Hoyt is, in fact, applied, except it said in 2012 he'd applied for such a permit. Is that still pending? It might be the government's brief. I can't remember which one. The issue with the special use permit application is that Mr. Hoyt asked the government to give him a special use permit to cross its easement. The government has an easement in the 41-acre strip. Mr. Hoyt asked the government. It's the 0.41-acre strip, not the 41-acre strip. Yeah. Right, 0.41-acre strip, 4100s. The 0.41-acre strip in Mr. Hoyt's position in the special use permit application was that the government had the ability and, indeed, the obligation to give him a special use permit to use their easement. Forget about the special use permit and the government's easement. Your client still needs access to cross the government's land. And, of course, the United States has said in this litigation that it's too late for that because the statute of limitations was expired. So my question to you is whether anything else in this litigation matters. If you're never going to be able to cross the government's land, why does anything else matter? I absolutely don't understand the government's position the way you do, Your Honor, with regard to whether a special use permit is going to be available to cross their 40 acres. It's my understanding that... Has Hoyt applied for such a permit? He has applied, I believe, for a permit that would cover both the 0.41-acre strip and then continue on up through the 40 acres that the government owns. And what has happened to that request? That's what I was trying to ask, yeah. The problem he's having with that special use permit application is that the government has taken the position that they don't think they have the right to give him a special use permit over their easement because all they have is an easement. And then they don't think there's any point in giving him a special use permit over the part of the road that's on their 40 acres because it doesn't do him any good. He can't get there. He has to go across something. He wants to go across the 0.41-acre strip. They're saying, well, we think we're bound by Indiana law, and we don't have the right to let anybody else use our easement like you to get to your land. And this is the thing that I just found that's referred to in footnote 4 of the government's brief on page 11. This is the special use permit he applied for on June 8, 2012. The government says he applied for a new special use permit June 8, 2012, which is still pending, and I assume they mean the application, not the date. I think we're waiting for the outcome of this litigation. What they have said is that if he succeeds on count one and becomes the fee simple title owner to the 0.41-acre strip, then he will be able to use that strip of land to get to the government's 40 acres. And then back down to Burma Road, right? Well, I was envisioning him coming up the strip from the Burma Road, but yes, both ways. So he's coming up from Burma Road up the strip. He'll get to the 40 acres that's owned by the government. Then the government could give him a special use permit across their 40 acres to turn the corner, so to speak, that Judge Easterbrook talked about, and get to his 40 acres. So he does need a special use permit to cross the government's land, and they're not ruling on it yet. So the only thing is, I mean, if the district court was correct, and I realize this is the central point of this part of your appeal, then he needs himself to acquire an easement from whoever it is who does own the 0.41 acres before the government will move on its special use permit. So, you know, if another party, I guess looking up this chain, it might, I'm not sure who would still own it, maybe the Fessels, or whoever their successor in interest is. Well, Mr. Fessels sold the property to the Benham's father, and he sold it to Mrs. Benham and her husband, so they're the successors to the Fessel title. Right, so he would have to go, these are these, what, the 1965 transaction, which Herman M. conveys something, but if it's an easement that Herman M. gives to the Owen couple, Fred and Bernice, then the 1968 deed from Herman M. to Nick Fessel still includes the fee title in this strip, right? And that's the Benham's position, but our position is that because that deed says that Mr. Fessel's... Yeah, that's, no, right, this is the deed that we're looking at, right? Yeah, the Fessel to Wells deed, actually, the more pertinent deed is the Fessel to Fessel deed, the deed from Herman M. Fessel to his son. Yeah, the 1968, 1960, I'm just trying to figure out all these transactions, honestly, it's just... In that deed, the older Mr. Fessel accepted out the .41 acres. He said, son, you can have 79 and a half acres, but I can't give you the .41 acres because I already sold it to the Owens. So that's one of our points in our argument as to interpreting the intent of the partnership. How does Lee get in and out of his property? Lee owns some other property to the north. Adjacent to him? All their properties connect to each other, yes. And that's on a road? They have, there's a county road, quarter of a mile, half a mile from Mr. Hoyt's property where the Lees live. So has Hoyt made any effort to get an easement from the Lees? He's talked to them, they won't give him one. It's been suggested by the... I thought they were kind of friendly, the Hoyts and the Lees. I thought they were friends. They're kind of friendly, but they won't give him an easement, and he doesn't have any legal right to sue them to get an easement. He thinks he has a legal right to sue the other neighbors to establish an easement, which is what he's doing. He has the right to sue who? The defendants in this case, the Benhams. The district court thought there might be some claim against the Lees if the severance of the, if the landlocked nature really occurs once the Lee parcel is carved off. And that all goes... That all goes to the issue of whether the old roadbed, which is referred to in the deed from Clark to Lee, has a status of being a public road. If it's a public road, then there would be an easement of necessity that Hoyt and Lee could have asserted to get across that property up to the road to the north. So that was a big issue. What did you mean when you said that if Hoyt just had an easement going down to the West Burma Road through the Fessel property, that they might not be able to use it if they subdivided their 40 acres, so there was more than one house there? Right, under the Selvia v. Rittmeyer case that we cite in the brief, Indiana law has a concept that prohibits overburdening and easement. So if you originally have a 40-acre... Well, what would overburdening be? Subdividing a larger parcel. For example, if there's one house going to be placed on a 40-acre parcel and there's an easement that goes to it and the gentleman that owns the 40 acres buys that easement so he can put his house, and that's the deal he makes with the person he buys the easement from, there's the expectation there's going to be one house up there. If you subdivide the 40 acres and put 50 houses on it, then the dominant... Well, did Hoyt, or McBride, whoever it was, was negotiating for the right-of-way, was there some negotiation about whether there would be an easement if McBride or its predecessor, Clark, whoever it was, subdivided his property? I'm not positive, but I think you might be talking about the Vessels and the Owens and their negotiations that led to the deed. Well, Hoyt's predecessor, right? Hoyt's predecessor was... Well, who negotiated the... Who acquired the right-of-way from Vessel or Vessel's predecessor? This is where we get kind of bogged down in the details of this case because there are so many roads and so many possible easements, so when you talk about the right-of-way, I'm not sure which one you mean. If you're talking about the right to use the strip, I can tell you who the owners of the chain of title of the strip. That's the part of the layout of this community where there's a narrow 30-foot-wide strip of land that goes from Bourbon Road straight to the Forest Service. That property was owned by Herman M. Vessel, and he sold that strip to the Norman... So when that transaction happened, the negotiation... We don't know what the negotiation was. It happened in 1965. Everybody who was a party to that negotiation is now deceased, and they were deceased at the time this litigation started. So we have very little evidence about what their negotiation was and very little way of determining what their intention was except for we can look at their subsequent actions and get some idea of how they interpreted what they had done. Their subsequent actions were that Mr. and Mrs. Owen tried to sell the Fee Simple title to that strip to the Forest Service when they sold the other 40 acres to the Forest Service. They said, hey, you want to buy 40.41 acres. So that was an indication that Owens thought they had purchased Fee Simple title to that strip, even though the deed said that what they were buying was real estate that's described as a right-of-way. And then the other thing, as I already mentioned, Mr. Vessel, when he conveyed to his son, said, I'm accepting out the .41-acre strip, presumably because he didn't own it, so he wasn't trying to give it to his son. So that's what we know about the negotiations, and the other thing we know is that the tax auditor transferred the strip from Vessel to Owen on the county records. And I'm way on my red lights. I can quit if you want me to. You can always answer a judge's question, of course, but I think we will thank you for your argument at this point and move on. Okay. Thank you. Ms. Andrie. Thank you, Your Honor. May it please the Court, I'm Deborah Andrie. I'm here on behalf of Michael and Sharon Benham and Ryan and Brenda Eubank. In count one of the complaint, Hoyt ceased to quiet title to the .41-acre strip, claiming ownership of that strip. The issue was decided, though, by the district court on what interest was transferred by the term right-of-way in that deed from Herman Vessel to Fred Owen in 1965. And the Indiana courts have given us a general rule for interpretation of this term. It's an easy rule, easy to apply. Transfer of a right-of-way means transfer of an easement, a right to use the land. But there's granting language in this thing that falls within a different Indiana rule, right, that says when you use these terms, convey and warrant, that you are probably conveying a fee simple. Isn't there a statute, the Conveyancing Act, doesn't it say that? That's true. So where are we? I mean, we have these ambiguous deeds, and we have behavior, as Mr. Savage is saying, that looks like people think it was a little bitty. Actually, almost half an acre is something you would find in different contexts, but .41 acres is its own tax parcel. People are excluding it from conveyances. Well, it was excluding a right-of-way or the easement, and it's appropriate to include that exception or exclusion in the deed so that everyone understands that there's a right-of-way or an easement here that's been transferred to what was the property of the Owens. So that was appropriate to exclude that and include that in the later deeds. So when the—let's see. In 1968, when Herman M. Fessel conveys to, I guess, his son, Herman N., Nick Fessel, how much—what's the extent of the land? Is that described as an 80-acre conveyance, or is that described as a 79.59? I would have to go back and look at the deed, but I believe it was an 80-acre tract accepting the right-of-way. I mean, it would be interesting to know, because if it was 79.59, then that would certainly suggest that the .41 isn't part of the parcel anymore. Correct. If it's 80, then it might tend toward your interpretation. And if you look at the intent, though, of the subsequent owners, of the Fessel 80 acres, Nick Fessel, who was the son of Herman, who received the property, thought he owned the whole 80 acres, including that .41-acre strip. So that's in the 1987 Fessel to Wells deed, and that's a deed for 80— I didn't bring these voluminous appendices because it's just too much. Yes, and that was a transfer of the 80 acres also, accepting the right-of-way that was already in place, going to the property to the north. Mr. Wells felt that he owned all 80 acres, including that .41-acre strip. And then when Mr. Wells transferred the property to the Benhams, he transferred that property, 11.5 acres, that included the fee simple ownership of the .41-acre strip. Did any of the parties suggest to the district judge that he ask for advice from an Indiana court? No, there was no request made by any of the parties. Wouldn't that be sensible? Wouldn't that have been sensible? Since Indiana law seems to be so messed up. Well, at the time that we did the trial, it seemed like at least as far as the Benhams and the Eubanks were concerned, the law was pretty settled. A right-of-way meant an easement, and there was no ownership interest for Mr. Hoyt to receive from the Owen heir. Well, you say it's settled, but what about the railroads? I know that Mr. Hoyt argued that the interpretation of right-of-way being an easement only applies in railroad cases, but that's not correct, and it's a very narrow use of that general rule. And I would cite as an example to Cochran v. Hoffman, which is 971 Northeast 2D670, an Indiana Court of Appeals case from 2012, where the Indiana court had to determine the scope of a right-of-way between two private property owners. And the language in that deed was grant of a right-of-way of the width of 16 foot for all purposes of travel. And the Indiana Court of Appeals found that that language clearly reflects the grantor's intent to create a general easement. So I think this general rule is— I was asking you about the railroad. Okay. Railroad was not involved in this transaction. Yes, I'm asking you about the railroad. Now, is there a different rule about the status of rights-of-way acquired by railroads? No, I think it's consistent. Between private individuals or railroads, a right-of-way is an easement. But aren't there cases that say that the railroad acquirers be simple? There may be some cases like that, Your Honor. But most of the cases—I thought most of the cases said the railroads just got an easement so that if the railroad use was ever discontinued, you wouldn't have these strange little strips of land owned by somebody else. Right, and that is my understanding of the cases. Of all the cases? Not all the cases. Why should it be simple? Let me ask you this. In terms of this—road number four is part of your client's concern, right? Yes. So I found it odd, since we're talking about land law, that the concept of use of a road was somehow tied to vehicles because it seems to me roads for centuries were used by people and horses long before there were any vehicles around to use them. So do you think the district court was relying too much on vehicular use to see if there was prior use? No, I don't believe so. I think the district court judge took consideration of the use by the horseback riders, the use by the hunters, but there just was a lack of enough evidence to support that there was a road across these lands. Well, that's the bottom line. I thought what the district court said was that the evidence didn't suggest that the horseback riders were using it under a claim of right, that they thought they were using it at sufferance rather than under a claim of right. Do you think the record supports that? Yes, I do. These horseback riders would come to a Boy Scout camp north of the Hoyt property, what became the Hoyt property, with their trailers and their vehicles, and they'd unload, and then they'd wander through the woods. This is primarily, except where the houses are, just a wooded, hilly area, and they would follow different paths, not always coming down that path, which included that .41-acre strip or Road 4. Do the Hoyts have any house or lean-to or something, some kind of human construction in their 40-acre? I believe there's a cabin that was constructed by Mr. Burden before the property was transferred to Mr. Hoyt. But the only way they can get there, so the lees allow them to walk through their property? That's the evidence that came in. So that's the only access the Hoyts have? Yes, directly to their property. Okay, thank you very much. Thank you. Mr. Brown, are you next up? It would help me. You're talking about a couple of other roads, right, the roads concerning your clients? Good morning, Your Honor. It pleases the Court. I am Daniel Brown. I represent the Barkers, John and Phyllis, that own the 40 acres immediately to the south of Mr. Hoyt. And the only road that my client has any dealings with is Road 4, and just a very small portion of it across the northwesterly part of their land. So is that this? I mean, this is the government's brief that has all of these roads in it. We're not worrying about Road 2 anymore, which looks like it goes through your client's land? Right. The only thing that was tried was prescriptive easement involving the bride's use. So just this little tiny part of Road 4? Right, right. That's all we're here. I don't understand. Why are you interested? Because this Burma Road runs through the Barker property. Right. The public road-by-user argument purported for Road 4, this purported road begins from Burma Road for just a few feet across the Barker land to the 0.41 acre. So how much are the Barkers? I mean, I can't ask this, but it seems like a great fuss over an extremely small interference with one's property. So you don't want them to take the little road 4 to the Burma Road because it crosses a minute fraction of your property? That's my client's contention. He's bought the property in 2000, he and his wife. What are we talking about in distance? Less than a couple hundred feet. A couple hundred feet? What's your problem with it, that they're using that couple hundred feet? Well, there's a long, long history of contact communication, but not necessarily in the record between Mr. Hoyt and my clients and the way they went about trying to determine their access of being sued, I think first brought into litigation in 2000. My question is, if you have this little 200 strip, it's the very edge of your property, why do they care? Because to them it's just a line on a map. It's not a road. It's never been a road. They don't know anyone that's ever treated as a road. I don't understand why they care. What are they doing with their 48? And this is a wilderness, isn't this? It's right. Yeah, so why do they care if someone, there's a little road that runs 200 feet at the very edge of the Barker property. Why do they care that someone is using that road to reach the Burma Road? They've had previous issues with prior owners of these. You're essentially saying this is a personal, irrational thing if I'm understanding your response. I wouldn't say my client's irrational, but maybe the plaintiff's irrational by suing them. What are they worried about? They purchased 40 acres of land free and clear of any easement or road and have been in litigation for over 10 years. What are they worried about? What plans do they have for their 40 acres that an occasional car driving over this little 200 feet to the Burma Road are going to interfere with? I don't know what the use is at this point. It's just it has grown up in load. Why would anybody litigate over this? I don't get it. There's nothing of value. We've asked for a court rule. 38 fees because it has been litigated to a trial court, and the trial court found that there wasn't 20 years of continuous use as a matter of claim of right. He finds that, and he also sort of alternatively says, well, if that was too strict a notion of use, there was abandonment as well. That's correct, and there was two gates put up. Yeah, so the gates, which are acquiesced in, I suppose. I don't know how difficult it would be to get around them, but they seem to be acquiesced in. So there's a finding of abandonment, and that's after the trial, right? So this is a finding of fact. Right, there's a finding of fact of abandonment prior to the litigation being initiated in 2001, first initiated in 2001. So Mr. Burden last used the property, I think, in 89, when there was a gate put up near the Burma Road, and no use was made under claim of right or otherwise across Barker property after that. Right, so it hasn't been used by vehicles since 88, and it probably hasn't been used at all for some 13 years or so. Right, prior to the litigation. Do the Barkers live on this property? They live on the south side of Burma Road, which would be the... They actually live there. Yeah, they live there. They're country folk. Okay, that's fine. All right, thank you very much, Mr. Brown. Thank you. Ms. Woods. You to thank for having this case here, Ms. Woods. It's the Forest Services, our federal jurisdiction. Yes, Your Honor. My name is Shalise Woods. I'm an assistant U.S. attorney. I represent the U.S. Forest Service. As the court is aware, there's only one remaining claim against the Forest Service. It involves what has been called Road No. 5. I would call it a throwaway claim in the complaint. Not much attention was paid to it in the district court or on appeal. That's this blue road that's north of the Benham property, right, and just a little bit west of the Hoyt parcel. Yes, Your Honor. Unlike the .41 acre strip or easement that we've been talking about this morning, there really isn't anything controversial or complicated about Road No. 5. It sits entirely on Forest Service land and has since 1967. I did want to address some questions the court... There is a request, according to counsel, for a special use permit, and why has that request not been acted on for three years? A couple of reasons, Your Honor. The first reason is this litigation. Mr. Hoyt and the Forest Service have amicably been... Granting that request, especially if the grant included part of the Forest Service's right over the easement, would entirely obviate this litigation. It would go away. Your Honor, the Forest Service's position as to the .41 acre easement is that they cannot give Mr. Hoyt what he... Well, have they made a ruling on the request and denied it for that reason? Not yet, Your Honor. You can't say the position is X, but we haven't actually taken that position. That would be a reason to deny the request, and then that decision could be judicially reviewed. But the Forest Service seems to be of the view that it's just not ever going to act on it, and then, of course, well, other than an APA suit to compel the Forest Service to make a decision, there couldn't be review. A sensible means of approaching this would have been either to grant it, and this litigation would cease to have a rationale, or to deny it, and then everything could be reviewed at once. The outcome of this appeal could favorably impact Mr. Hoyt's application. He knows that. The Forest Service knows that. So they are acting reasonably and have agreed. Well, I don't understand. Why doesn't the Forest Service wire him to use its road, use your road? Road number five? That lies entirely on Forest Service land. He would like to pave a driveway, pour concrete and blacktop and whatnot, pave a driveway through a portion of the Hoosier National Forest. Wait, I don't understand you. He wants to pave this road number five? Ideally. That's what he's asking for. And you don't want him to pave it? Well, I would say the Forest Service's position is right now he has no way to get from Burma Road to the Forest Service property. And he would still need to resolve this tiny issue with the barkers because he can't get all the way down to Burma Road through the strip. Yes. So right now the Forest Service says, look, if we look at our regulation and our policies, why would we give him permission to put a driveway or a paved road through our forest land when he still has no legal right? There are a bunch of things the Forest Service could do. It could deny the application for reasons like the ones you just stated, but it hasn't done that. It could say we grant the application contingent on getting the rest of the only if it's used no more than X and doesn't otherwise change the environment. Or you could do something else. The world is not limited to inaction forever or a paved road. Your Honor, I would suggest that the Forest Service is acting reasonably in working with Mr. Hoyt in order to give him what he wants. It isn't working with him. It hasn't ruled on his application for three years. I don't think he wants them to deny the application when a month from now this Forest Service is working with him. They're negotiating over what? Whether it's to be paved or not paved? Mr. Hoyt's application asked for a number of different alternatives to his land from the Forest Service. They're looking at those alternatives with him. They went back to him and said, we have to go through the NEPA process. He has to pay the cost of that. It's pretty costly. I can't believe that this is substantial federal action. Your Honor, it is. It has to go through the NEPA process before the Forest Service can do it. That just sounds ridiculous. That's just a parody of NEPA. Well, Your Honor, there are endangered species. We haven't yet reached the world where any federal action is the same thing as substantial federal action. But you get an agency ruling, do you not, about whether NEPA applies? Yes. I'm told under the Forest Service regulations they have to go through the NEPA process for this type of request. And there's been no challenge to that? I'm sorry. There's been no challenge? They've gone to Mr. Hoyt. Would this be true if he didn't want a paved road? I think even if he wanted a gravel road. He wants unfettered access. But there is a road there already. No, Your Honor. There's nothing? No. I know we're all calling this road number five. There's no road there. Would trees have to be knocked down? Potentially, yes. I have not walked it myself, but that's what I'm being told, yes. So you're saying he wants to build a road? Yes. And it's a deer path now or something? It is against Forest Service policy to give someone a road to nowhere. It doesn't make any sense public policy-wise. By the way, why is everybody talking about road number five rather than about ten square feet of Forest Service land, which is all you need to turn the corner into the Hoyt 40? Road number five is actually quite a long road. Yes. Yes, it is. Has he requested ten square feet just to leap over the corner? Yes, he has. And depending on the outcome of this appeal, that will impact his pending application. Wait, I don't understand. So what you want us to do is issue an advisory opinion to the Forest Service about whether it should grant a pending application? No, Your Honor. We take no position on who owns this .41 acre strip, but a decision from this court would end that controversy. But if he actually just wanted ten feet of Forest Service land, wouldn't you just give it to him? I can't answer that. I would say that if it's- Well, wait a second. Isn't there some concept of de minimis, absolute trivia? The Forest Service regulations say that they will consider applications for special use permits for the landowner's use and enjoyment of their own land for situations like this. So you think the ten feet wouldn't need a lot of procedure in order to say, yeah, you want ten feet in this wilderness? Yeah, you can have ten feet. It would require a lot less rigmarole, yes. But DeVoit's haven't asked for that, as far as you know. He has, but it's contingent upon whether he owns that .41 acre strip. Yes.  Thank you. Anything further, Mr. Savage? I could go on. You need to come up to the microphone. Otherwise we will not have a record of this argument in the future. Sorry. What about the ten feet? Wouldn't that be a satisfactory alternative? The ten feet would be wonderful if we could get to the ten feet. We've got all these theories about how to get to the ten feet. One is to become the owner of the .41 acres. That's why Mr. Hoyt bought the .41 acres from Norman Owen, who was the heir of Fred and Bernice. That would solve it. That's count one. The other thing that would solve it would be to win on count two. I didn't get to talk about count two at all in my opening presentation, but there was a fundamental error of law that the district court made under count two because he didn't understand or his opinion indicated a lack of understanding of what's meant by claim of right under Indiana law. And Judge Easterbrook was asking, well, was this under claim of right that these horseback riders were riding or at sufferance? And that's not the concept. The concept is, is there indiscriminate permission to use the road on the part of the landowner or is it a use that is permitted to just a select few? If it's indiscriminate permission, then that's considered a claim of right under Indiana law. And that is what we think that the district court did not understand. We think the district court confused the public highway by user law and the law applicable to prescriptive easements. Under the law to establish a prescriptive easement in Indiana, if there's any permission at all, then you can't get a prescriptive easement. It has to be hostile use for 20 years. It's completely different under the public highway by user. Okay. I think you need to stop now. Thank you very much. Thanks to all counsel. I take the case under advisement.